IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19CR1434 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| LYRON WOOLRIDGE, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM

**COMES NOW**, Defendant Lyron Woolridge, by and through his counsel of record, Assistant Federal Public Defender, Melissa Ayn Morris, and pursuant to 18 U.S.C. § 3553(a), United States Sentencing Guideline Section and respectfully submits this Sentencing Memorandum and Objections to the Presentence Report filed on September 17, 2021 (Doc. 49). Mr. Woolridge respectfully requests that this Honorable Court impose a reasonable sentence of 60 months followed by four years of supervised release for the offense. Mr. Woolridge respectfully requests that this Honorable Court vary downward from the otherwise applicable guideline range in this case to a sentence of five years based on the facts and circumstances of his life.

**I. OBJECTIONS TO THE PRESENENTENCE INVESTIGATION REPORT**

Mr. Woolridge is currently before this Honorable Court for sentencing after pleading guilty to Distribution of 50 grams and more of a Mixture and Substance Containing Methamphetamine (Doc. 43). United States Probation filed its Presentence Investigation Report (hereinafter PSR) on

September 17, 2021 (Doc. 49). Mr. Woolridge objects to the extent it makes several claims, which Mr. Woolridge asserts are factually inaccurate.

### A. U.S.S.G. SECTION 2D1.1(b)(1) IS INAPPLICABLE

Mr. Woolridge objects to paragraphs 13, 17, and 23 of the PSR which apply a two-level increase to his base offense level pursuant to United States Sentencing Guideline § 2D1.1(b)(1). There is no evidence that Mr. Woolridge possessed a firearm. Even if the court finds that he did possess a firearm, there is no evidence of any physical relation between a firearm and drug trafficking activity. USSG § 2D1.1(b)(1) provides for a two-level enhancement for drug crimes "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). The application note to this section states that the enhancement "reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. App. N.11(A).

In order for the two-level enhancement to apply, "[t]he government must show by a preponderance of the evidence that 'a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant…'" *United States v. Sallis*, 533 F. 3d 1218, 1225 (10th Cir. 2008)(quoting *United States v. Pompey*, 264 F.3d 1176, 1180 (10th Cir. 2001)(internal quotation omitted)). "If it does so, the burden shifts to the defendant, who must demonstrate that this connection is clearly improbable." *United States v. Sallis*, 533 F.3d at 1225. "[T]he government need only show that 'the weapon was found in the same location where drugs or drug paraphernalia are stored,'" *United States v. Gonzalez*, 200 F.Supp.3d 1265, 1268 (D.N.M. 2016)(Browning, J.)(quoting *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1186-87 (10th Cir. 2004). To meet its burden the government may show "that the weapon was located nearby

the general location where drugs or drug paraphernalia are stored or where part of the transaction occurred." *United States v. Gonzalez*, 200 F.Supp.3d at 1268 (quoting *United States v. Flores*, 149 F.3d 1272, 1280 (10th Cir. 1998).

In the instant case, according to the CI, while in Larry's room at the Best Choice Inn Motel, Larry reached under his bed and pulled out a couple of "big guns" and laid them on the bed. PSR at ¶ 13. The CI alleges that Mr. Woolridge was present in Larry's room when this occurred, sometime after the drug transaction between the CI and Mr. Woolridge. PSR at ¶¶11-13. This incident occurred in Larry's room, not a room occupied by Mr. Woolridge. The CI offered no description of the alleged "big guns", and most importantly, no guns were ever recovered by law enforcement. This statement made by the CI is completely uncorroborated, and is inadequate to support an enhancement.

Even if the court finds the uncorroborated statement of the CI credible, the enhancement should still not apply. There is no temporal and spatial nexus between the alleged "big guns" and the drug trafficking activity, as the Tenth Circuit Court of Appeals requires. *See United States v. Sallis*, 533 F.3d 1218, 1225 (10th Cir. 2008). There is no evidence that the alleged firearms were in the same location where drugs or drug paraphernalia were stored, or that there was any special relationship between the alleged firearms, the drug-trafficking activity, and Mr. Woolridge. As noted by the PSR, the drug transaction between Mr. Woolridge and the undercover agent (UA) occurred at a separate location which the UA and Mr. Woolridge traveled to by vehicle. PSR at ¶ 11. When the CI and Mr. Woolridge returned to the motel it was to retrieve the UA's bicycle. PSR at ¶ 12. The drug transaction had already been completed in some other, unknown location. Absent a nexus between Mr. Woolridge, the firearms, and drug-trafficking activity, the enhancement is misapplied.

The Tenth Circuit Court of Appeals addressed this issue in *United States v. Castro-Perez*, 749 F.3d 1209 (2014). There the district court applied U.S.S.G. § 2D1.1(b)(1)'s enhancement where the defendant sold a gun to an undercover agent on the same day he also sold cocaine to the agent. *United States v. CastroPerez*, 749 F.3d at 1210. The Tenth Circuit found that the two-level enhancement was not warranted because the government failed to establish that Mr. Castro-Perez possessed a firearm in the vicinity of drug trafficking activity, and "there was no physical relation between the weapon and the drug trafficking activity," since the gun was delivered after the drug transaction. *United States v. Castro-Perez*, 749 F.3d at 1211. The Court reiterated that "…physical proximity is a touchstone of the §2D1.1(b)(1) firearm enhancement, even if established through relevant conduct or that of a coconspirator." *United States v. Castro-Perez*, 749 F.3d at 1211. "When a firearm is not physically near drugs or trafficking activities, the 'increased danger' of mixing drugs and guns contemplated by the Guidelines is not present." *United States v. Castro-Perez*, 749 F.3d at 1211. *See* U.S.S.G. §2D1.1 app. cmt. N. 11(A). In the instant case, since there is no evidence that the alleged guns were physically near drugs or trafficking activities, the enhancement is misapplied.

**B.  AN INCREASE PURSUANT TO U.S.S.G. SECTION 2D1.1(b)(2) IS INAPPLICABLE**

Mr. Woolridge objects to paragraphs 13, 15, 17, and 24 of the PSR which apply a two—level increase pursuant to U.S.S.G. §2D1.1(b)(2) based on an incident that allegedly occurred while Mr. Woolridge, the CI, and Larry were in Larry's room. According to the CI, Larry and Mr. Woolridge were whispering to each other before asking the CI whether they were a snitch. PSR at ¶ 13. The CI alleges that Larry pulled out "big guns" from underneath his bed, and laid the guns

4

on the bed, and then Larry and Mr. Woolridge checked CI for recording devices. PSR at ¶13. According to probation, this constituted a credible threat to use violence.

Section 2D1.1(b)(2) applies where a defendant (1) "used violence," (2) "made a credible threat to use violence," or (3) "directed the use of violence." The alleged conduct here does not fit into any of these three categories. According to USPO, Mr. Woolridge and Larry acted together to threaten the CI by allegedly pulling out guns and laying them on a bed. This is not a credible threat to use violence. "True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). A true threat must place the "victim in fear of bodily harm or death." *Virginia v. Black*, 538 U.S. at 360.

As with the recommended enhancement pursuant to section 2D1.1(b)(1), this recommendation is based solely on the uncorroborated statement of CI. There is no evidence that the alleged guns were ever pointed at CI, or that either Mr. Woolridge or Larry ever said that the guns would be used. In fact, there is no evidence of what if anything was said to the CI. Furthermore, there is no evidence that Mr. Woolridge was acting with Larry, when Larry allegedly pulled out the guns and laid them on the bed. As the PSR indicates, the room in which this alleged incident occurred was Larry's, and there is nothing to suggest that Larry's actions would have been reasonably foreseeable to Mr. Woolridge. *See* U.S.S.G. § 1B1.3(a)(1)(B) (providing that relevant conduct for "jointly undertaken criminal activity" includes "all acts … of others that were …reasonably foreseeable").

Even if the Court finds that by allegedly lying guns out on his bed, Larry caused the CI to feel threatened, this alone does not rise to the level of a credible threat to use violence. For instance, the Eight Circuit Court of Appeals found a credible threat of violence where defendant

5

said he was going to find and shoot an individual who allegedly stole from him and confronted the individual with a firearm. *See United States v. Sykes*, 854 F. 3d 457, 460-61 (8th Cir. 2017). Similarly, the Eleventh Circuit Court of Appeals found sufficient evidence of both the use of violence and the threatened use of violence where defendant threatened to kill at least once co-conspirator and her daughter and punched her in the neck for conduct related to the conspiracy, and threatened to hurt another coconspirator if she failed to properly dispose of drug manufacturing. *United States v. Walker*, 578 F.App'x 812, 820 (11th Cir. 2014). The alleged conduct in the instant case does not rise to the level of a credible threat to use violence.

**C. CORRECTLY CALCULATED GUIDELINE RANGE**

Should the Court sustain Mr. Woolridge's objections, the base offense level should be 30. After acceptance of responsibility, the total offense level is 27. Based upon a total offense level of 27 and a criminal history category of III, the guideline imprisonment range is 87-108 months.

**II.   STATEMENT OF FACTS**

Lyron Woolridge was born August 7, 1991 in Amarillo, Texas to Jonita Woolridge and Charles Bell. Growing up, Lyron never had a relationship with his father. He was raised by his mother, along with his four siblings. As a single mother, Jonita Woolridge had to work several jobs to support her children. This meant that they were often left alone, so Lyron had to care for his younger siblings. At times, Jonita disappeared for extended periods of time, leaving the children to fend for themselves. Lyron suspects that when she would leave for extended periods, it was due to a romantic relationship with a man. At times, things were so bad that Lyron and his siblings were left without electricity, and they were forced to prepare food using the fireplace. This eventually took its toll on Lyron, and he left home at only 15 years-old.

Initially, Lyron lived mostly on the streets. He bounced around from place to place, and he began associating with the wrong people. During this period, Lyron started using drugs and alcohol. He was only 15 years-old when he first smoked marijuana and drank alcohol. He soon progressed to using opiates, first pills and eventually heroin. His drug use soon became a daily habit, sometimes using two grams of heroin a day. Although he occasionally used methamphetamine, heroin was his drug of choice.

When Lyron was 17, he was able to gain some stability when he moved in with his maternal grandfather. He and his grandfather grew very close, and he became more of a father figure to Lyron. His grandfather offered Lyron the love and support he often missed at home. When his grandfather began exhibiting signs of Alzheimer's, Lyron took care of him. Tragically, his grandfather had an accident while Lyron has been incarcerated and he is quadriplegic. He currently lives in a rehabilitation facility in Albuquerque.

Lyron's mental health issues have further complicated his life. He was diagnosed with Post Traumatic Stress Disorder in 2015. He also suffers from anxiety. However, for the majority of his life he has not taken the proper medications to treat these disorders. Although Lyron realizes that these medications help him have a stable and normal mood, Lyron has often self-medicated by using street drugs.

During his time in custody, Lyron has reflected on his life and his need for change. He is acutely aware that his drug addiction is at the root of all of his problems. He has benefitted from the support he has received from his fiancé, Nicole Johnson, as well as from his mother and siblings. Their support has encouraged him to live a sober life moving forward. To that end, Lyron would like to participate in the Residential Drug and Alcohol Program (RDAP) while in custody, so that he may learn to develop coping skills vital to maintaining his sobriety. He would

also like to study for his Commercial Driver License (CDL) so that he can obtain gainful employment once he is released.

## III. ARGUMENT

### A. 18 U.S.C. §3553 (A) FACTORS

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). Consequently, a sentencing judge always retains the essential discretion to impose a fair sentence after considering the nature and circumstances of the offense, the defendant's history and characteristics, and the need for the sentence to reflect the seriousness of the offense, to afford adequate deterrence and to impose a just punishment. 18 U.S.C. § 3553(a).

A sentencing court must begin its analysis by correctly calculating the applicable Guideline range and then should consider all of the section 3553(a) factors to determine whether they support the sentence requested by the parties. *Gall v. United States,* 552 U.S. 38, 39 (2007). The Court must make an individualized assessment based on all of the facts to determine whether a departure or variance is warranted. *Ibid.* After conducting this inquiry, a District Court is free to impose <u>any</u> sentence that is "reasonable" and may depart or vary from the Guidelines for any fair and just reason. *United States v. Smart,* 518 F.3d 800, 804 (10th Cir. 2008.)

This Court is required to consider the factors listed under Title 18 U.S.C. §3553(a) when deciding what the appropriate sentence should be. *United States v. Booker*, 543 U.S. 220, 260-262 (2005). If the factors listed in §3553(a) support a sentence outside the guidelines, the

8

sentencing court is now free, under *Booker*, to impose that sentence outside the guidelines. Under §3553(a), this Court must consider:

1. The nature and circumstances of the offense and the **history and characteristics of the defendant**;

2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and provide just punishment and deterrence, to protect the public from further crimes of the defendant and to provide the defendant with education, training, medical care or other correctional treatment;

3. The kinds of sentences available;

4. The need to avoid unwarranted sentence disparities among defendants with similar records who are guilty of similar conduct;

5. The need for restitution. (Emphasis added).

a. <u>**Nature and Circumstances of the Offense and History and Characteristics of the Defendant**</u>

Lyron Woolridge is a 30 year-old man who grew up under difficult circumstances. His father has long been absent from his life. Lyron's mother was a single mother, who worked several jobs to make ends meet. His mother was often away from home, sometimes for long periods of time. Her absence negatively impacted Lyron, as he was left without guidance, and forced to care for his younger siblings. Due to the stress of his situation, Lyron foolishly turned to the streets for support. He began using street drugs and alcohol as a means of coping with his reality. His poor choices ultimately led to contacts with the criminal justice system. Although his family is

understandably concerned and confused by his actions, they support him, and he maintains a close relationship with them.

There can be "no limitation . . . placed on the information concerning the background, character and conduct of a person convicted of an offense which a court . . . may receive and consider for the purposes of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, information about the adverse childhood experiences of the defendant and his predisposition to the disease of addiction is an appropriate subject for the Court's consideration prior to the imposition of any criminal sentence.

Around the time of the incident, Lyron Woolridge had relapsed and his life was in a tailspin. His only concern was supporting his drug habit. It was under these circumstances that Lyron engaged in drug trafficking activity. His poor decisions let both himself and his family down. For this he is extremely regretful.

Drug addiction is an illness, which may be contracted innocently or involuntarily. *Robinson v. California,* 370 U.S. 660,667 (1962). Drug addiction is a disease of the mind, which manifests itself as an irrepressible drive to take a drug, despite the undesirable consequences. It is a result of a reconfiguration of the circuitry of the reward and decision-making systems of the brain, which leads to increased cravings for the drug, accompanied by diminished impulse control. In Lyron Woolridge's case, he began using drugs as a method of coping with his traumatic childhood, and mental health issues.

Diseases require treatment, not incapacitation. As the Supreme Court noted in *Robinson,* "it is unlikely that any state at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might

determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment." *Robinson,* 370 U.S. at 666.

Like mental illness or trauma, drug addiction cannot be offered as an excuse for this crime. It is, however, an explanation for Lyron's behavior. More important it is a factor in mitigation, which this Honorable Court may consider in arriving at an appropriate sentence. Cf. USSG § 5H1.4.

Lyron's history of drug addiction, the fact that he was relapsing at the time of the instant offense, and his desire for treatment, which again relate to the nature and circumstances of the present offense, his history and characteristics and his need for treatment. *Cf.* 18 U.S.C. § 3553(a)(1) and (a)(2)(D). Therefore, Lyron's untreated drug addiction is an additional fact, which the Court must consider in arriving at a just sentence.

**b.** **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and provide just punishment and deterrence, to protect the public from the further crimes of the defendant and to provide the defendant with education, training, medical care or other correctional treatment**

Lyron Woolridge's personal history and characteristics, including his difficult childhood circumstances and subsequent drug abuse not only explains many of his past actions as the Court considers the nature and circumstances of the present offense, these factors also provide support for a departure or variance. Lyron's drug habit clouded his judgment and impaired his thinking, causing him to engage in behaviors he should not.

Lyron has extremely strong family support. He has a fiancé with whom he is planning a future, as well as siblings with whom he remains close. Lyron has also worked to repair his

relationship with his mother. "The single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return. Studies have shown that prisoners who maintain family ties during imprisonment are less likely to violate parole or commit future crimes after their release than prisoners without such ties." *Recidivism and Parental Engagement*, 40 Family L.Q. 191 (2006). Lyron's family circumstances also suggest that a sentence below the guideline range is appropriate in this case.

In light of all of these unique circumstances, Lyron respectfully submits that the sentence recommended by the United States Sentencing Guidelines is greater than necessary, to promote respect for the law and provide just punishment. "Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else." USSC, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 131 (2004)*. "For several categories of offenders, an incapacitation strategy of crime prevention can misfire because most or all of those sent to prison are rapidly replaced in the criminal networks in which they participate. Street-level drug trafficking is the paradigm case. Drug dealing is part of a complex illegal market with low barriers to entry. Net earnings are low, and probabilities of eventual arrest and imprisonment are high. Drug policy research has nonetheless shown consistently that arrested dealers are quickly replaced by new recruits…. Arrests and imprisonments of easily replaceable offenders create illicit 'opportunities' for others." National Research Council, The Growth of Incarceration in the United States: Exploring Causes and

Consequences 146 (Jeremy Travis et al. eds., 2014), http://nap.edu/catalog.php?record_id=18613. See also Id. at 88 ("Most drug policy analysts agree that … imprisoning individual drug dealers seldom reduces the availability of drugs or the number of traffickers.").

In light of the nature and circumstance of the offense, Lyron's traumatic childhood, history of addiction, and strong family support, a sentence of 60 months incarceration with supervised release is the appropriate sentence. A sentence of 60 months is an extremely significant sentence. When Lyron is released he will be approximately 34 years-old. He will have availed himself of vocational training opportunities while in Bureau of Prisons custody so that he may obtain gainful employment upon release. He will have participated in RDAP and learned the skills necessary to maintain his sobriety. These factors alone decrease the likelihood of him recidivating, thus negating the need to impose a longer sentence.

## IV.  CONCLUSION

WHEREFORE, counsel urges the Court to sustain Mr. Woolridge's objections, and depart or vary downward and respectfully requests a sentence of 60 months incarceration with four years of supervised release to follow, which is sufficient but not greater than necessary to accomplish the goals of sentencing.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

*Electronically filed October 8, 2021*
/s/ Melissa Ayn Morris
Assistant Federal Public Defender